## JESSE M. HUBBARD AND WIFE *v.* PHILIP V. MANWELL.

*Water Course and Water Rights. Riparian Owners. Alluvion, Division of.*

When alluvion is formed on lands bordering on an unnavigable river, owned by conterminous proprietors, the rule for distribution of the accretions is to extend the side lines of each owner to the nearest river bank, giving to each the the alluvial deposits in front of his own land, especially if equitable.

TRESPASS on the freehold. Heard by the court on a referee's report, Chittenden County Court, September Term, 1886, TAFT, J., presiding. Judgment *pro forma* for the plaintiffs. Exceptions by defendant.

The referee found as follows :

"At the time of the commencement of this suit, and at the time of her death, which has since occurred, Aurissa W. Hubbard, one of the plaintiffs, and the wife of Jesse M. Hubbard, the other plaintiff, was the owner in fee of a piece of land on the southerly side of the Winooski (formerly Onion) River, in Burlington, of the width of about 27 rods; and had been such owner ever since October 3, 1874, having acquired her title thereto under a deed from one Lyman and his wife to one Ballou, dated July 12, 1836, and through various intermediate conveyances, one of which was from Myron and Seth Morse to the plaintiff, Jesse M., dated June 16, 1859, since which date said Jesse M. has been in continuous occupation thereof. But it did not appear that after his wife became the owner of the land, he had or claimed any right or title to it except such as resulted from his marital relation. The description of the premises in said deed from Lyman and wife to Ballou was as

follows : ' Beginning at a stake standing on the bank of Onion (now Winooski) River, being the northeasterly or up-river corner of that part of said lot No. 30, which was heretofore owned by David Russell and Stephen Russell ; thence south * * * ; thence north 59 deg. 30 min. ; east 26 chains, to the bank of Onion River ; thence down said river, by the bank thereof, to the place of beginning, containing 14 69-100 acres.'

" The defendant, at the time of the committing of the alleged trespasses, was the owner in fee of a farm, of the width of about 90 rods, adjoining said land of Mrs. Hubbard, and lying next below it on said river, and had been such owner since November, 1868, having derived his title by deed from one Fletcher, who acquired his title by the foreclosure of a mortgage executed to him by one Adams on the 28th day of November, 1849, in which mortgage the defendant's farm is described as follows : ' Being the whole of 100 acre lot No. 198, the half of lot No. 197, the south part of lot No. 21, and and the north part of lot No. 30, and bounded on the north by land owned by J. B. Bixby and land lately owned by C. P. Van Ness, on the east by Onion River 3 * * *.'

" For many years previous to the committing of the alleged trespasses, the bank of the river along the entire river front of Mrs. Hubbard's land, about 50 rods in length originally, and extending down stream a distance of nearly 50 rods along the defendant's original river front, had gradually and imperceptibly receded towards the north by deposits and accretions made thereon by the stream, until, at the time of the alleged trespasses (extending the side or land lines of Mrs. Hubbard's said land straight to the new river bank), the alluvion so formed in front of her said land amounted to about five acres, and that so formed on the defendant's land amounted to about eight and one half acres, a portion of which alluvion, opposite the land of each party, was covered with trees of various sizes ; and during the same period the defendant's entire river bank, about 100 rods in length below said alluvial deposit, was gradually worn off and carried away by the stream, causing a loss to him of about seven acres of his land situated on that portion of the bank.

" Before the referee the plaintiffs claimed that the alluvion so formed on the old bank of said stream should be divided between the parties by a line called ' division by shortest dis-

tance,' drawn from the point of intersection of Mrs. Hubbard's westerly line with the old bank of the river, as described in said deed from Lyman and wife to Ballou, marked ' C ' on the map hereinafter referred to, northwesterly to the nearest point on the present river bank perpendicularly to the thread of the stream, making an acute angle with said westerly line, as defined in said deed ; or, if that line of division should not be considered the true and correct one, then said alluvion should be divided between the parties by a line called ' division by chord perpendiculars,' according to the rule laid down in *Emerson* v. *Taylor*, 9 Me. 44, extending from said point of intersection, nearly north, to the present river bank, striking the same at a point about 19 3-4ths rods up stream, or easterly from where said line, called ' division by shortest distance,' strikes the present bank ; or, if neither of said two lines of division should be adopted, then a line called ' division by proportional of old and new shore,' according to the rule adopted in *Deerfield* v. *Arms*, 17 Pick. 41, dividing said accretion between the parties in proportion to the extent of their respective lines on the old river bank, should be adopted ; which last mentioned line would extend from the same point ' C ' as the other two, and strike the new river bank about six and one-fourth inches farther up stream than said line of chord perpendiculars.

" The defendant claimed that the true line of division of said alluvion was a line corresponding with the westerly line of Mrs. Hubbard's land, as described in Lyman and wife's deed to Ballou, extended to the new river bank.

" In making this division of the accretion, as claimed by the plaintiffs, both by chord perpendiculars and by proportional of old and new shore, that portion of the shore line, and only that portion which bounds the entire accretion, not only against plaintiffs' and defendant's land, but also against the the land of Reynolds, the proprietor next above, was considered.

" From the year 1859, when Jesse M. purchased his lot, to the winter of 1881, the said Jesse, without the knowledge of the proprietors of the defendant's lot, from time to time, as he had use for the same, cut fence poles, stakes, and some wood for his own use on this alluvial tract, mostly above the line of division contended for by the defendant, but in some years below that line, upon the territory in dispute. He also picked

up some flood-wood on that territory, made temporary fences on the disputed tract, and in the winter of 1881–82 felled several large trees below the line, as claimed by the defendant, which defendant afterwards appropriated. The defendant, also, from time to time, has cut poles for fencing on this disputed tract.

"During the winter of 1881–82 the defendant cleared two and twelve one-hundredths acres of the alluvial land in dispute, cutting and drawing away 110 cords of wood, of the value of $75, all of which wood was cut upon land lying between the line, as claimed by the defendant, and the 'line of shortest distance,' as claimed by plaintiffs, and two-thirds of which, in both value and amount, was cut between the line, as claimed by defendant, and the 'line of chord perpendiculars' or 'proportional parts of old and new shore,' as claimed by plaintiffs. And I attach hereto a diagram showing, with accuracy, the whole locality connected with the matters in dispute in this case.

"The irregular lines designated on the map as 'the old river bank,' marks the bank of the river as it was in 1836; and the original corner between the plaintiffs' and the defendant's premises, described in the deed as the up-river corner of the Russell lot, is a point on the old river bank marked 'C' upon said map."

The deed from Lyman and wife to Ballou contained the following clause in addition to the description given in the referee's report: "Meaning and intending hereby to convey the same land which was conveyed by Moses Catlin to Amasa Paine by deed bearing date January 29, A. D. 1806."

Deed of Catlin to Paine: "Beginning at a stake standing on the south bank of Onion River * * *; thence running south 58 degrees W. 24 ch. 66 li. * * *; thence N. 58 degrees E. in the easterly line of land occupied by David Russell and Stephen Russell, as aforesaid, to the aforesaid south bank of Onion River, thence up said river to the first-mentioned bounds."

Deed of Ballou to Bishop, October 28, 1836: "Part of lot No. 30 of the 103 acre lots, beginning at a stake standing on the bank of Onion River, being the northerly or up-river corner, etc.," the rest of the description being the same as that in the deed of Lyman and wife to Ballou.

"Meaning and intending hereby to convey the land which

was conveyed by Moses Catlin to Amasa Paine, by deed bearing date January 29, A. D. 1806, and the same that was conveyed by deed to me by Lewis and Mary B. Lyman on the 12th day of July, A. D. 1836."

Deed of Bishop to Brown, June 2, 1838 : " Part of lot No. 30 of the hundred acre lots, beginning at a stake standing on the bank of Onion River, being the northerly or upper corner of that part of said lot which was heretofore owned and occupied by David Russell; thence S. 59 deg. 30 min. W., etc. * * *; thence N. 59 deg. 30 min. E. 26 chains to the bank of Onion River; thence down said river to the place of beginning, containing 14 69-100ths of an acre of land, be the same more or less."

The descriptions in the other deeds from Brown to Peck, from Peck to Morse, from Morse to Hubbard, consisted for the most part of references to former deeds.

*Hard & Cushman*, for the defendant.

I. The death of Mrs. Hubbard abated the suit. 1 Chit. Pl. (16th Am. ed.) 85 ; Schoul. Husb. & Wife, ss. 167, 424 ; *Pettingill* v. *Butterfield*, 45 N. H. 195 ; *Fuller* v. *H. R. R. Co.* 21 Conn. 557 ; *West* v. *Jordan*, 62 Me. 484.

II. As by the terms of the deed from Lyman and wife to Ballou, through which Mrs. Hubbard's title was derived, the river-side line of the line conveyed is defined as the *bank* of river, no subsequent accretions thereto would enure to the benefit of the owners of that land. Mrs. Hubbard, therefore, never had title to *any* of the alluvion mentioned in the referee's report. Gould on Wat. s. 200 ; 3 Wash. R. P. 354, *note* ; 1 Wait. Act. & Def. 711, 716 ; *Child* v. *Starr*, 4 Hill, 369 ; 17 N. Y. C. L. 893 ; *Canal App.* v. *People*, 17 Wend. 596 ; S. C. Book 13, N. Y. C. L. 247 ; *Halsey* v. *McCormick*, 13 N. Y. 296 ; *Yates* v. *Van De Bogart*, 56 N. Y. 526, 531 ; *Hatch* v. *Dwight*, 17 Mass. 289, 299 ; *City of Boston* v. *Richardson*, 13 Allen, 146, 155 ; *Nickerson* v. *Crawford*, 16 Me. 245 ; *Bradford* v. *Cressy*, 44 Me. 9 ; *Stone* v. *Augusta*, 46 Me. 127 ; *Lincoln* v. *Wilder*, 29 Me. 169, 179 ; *Rix* v. *Johnson*, 5 N. H. 520 ; *Daniels* v. *Cheshire R. Co.* 20 N. H. 85 ; *Morrow* v. *Willard*, 30 Vt. 118.

Nor is the construction of that deed affected by the clause in it, beginning "Meaning and intending to convey the same land" conveyed by Catlin to Paine. *Hibbard* v. *Hurlbert*, 10 Vt. 173, 180 ; *Gilman* v. *Smith*, 12 Vt. 150 ; *Spiller* v. *Scribner*, 36 Vt. 245 ; *Keenan* v. *Cavanaugh*, 44 Vt. 268 ; *Howe* v. *Bass*, 2 Mass. 380 ; *Pernam* v. *Wead*, 6 Id. 131 ; *Melvin* v. *Proprietors, etc.* 5 Met. 16 ; *Dana* v. *Bank*, 10 Met. 250 ; *Preston's Heirs* v. *Bowmar*, 6 Wheat. 580 ; S. C. Bk. 5 (L. ed.), U. S. Sup. Ct. Rep. 386 ; 4 Kent, 466 ; 3 Wash. R. P. 350, 352 ; 1 Wait. Act. & Def. 714.

III. If Mrs. Hubbard had title to any of the alluvion, a division of it by an extension of the westerly line of her land, as described in said deed from Lyman and wife to Ballou, to

the new river bank, is as favorable a line to her as she was legally entitled to upon the facts reported.

No rule for the division of alluvial accretions between conterminous riprarian proprietors has ever been authoritatively adopted in this State. The members of the court were not unanimously in favor of the decision in *Newton* v. *Eddy*, 23 Vt. 319. Judge REDFIELD was in favor of adopting a rule similar to that contended for by the defendant in this case. The soundness of *Newton* v. *Eddy* as an authority in support of any rule of division of alluvion has been questioned. *Batchelder* v. *Kiniston*, 51 N. H. 496.

It is not practicable to adopt any general and uniform rule which will not, in many cases, do absolute injustice to one party or the other. The Massachusetts courts, which seem to have had much to do with this question, concede the impracticability of devising a general rule. In *Deerfield* v. *Arms*, 17 Peck. 44, the court says : "This is a *curious*, and in any aspect in which it may be presented would be *a very difficult subject*, as well as the analogous one of the division of flats or lands bounding on salt water, over which the tide ebbs and flows, among conterminous proprietors, *were it necessary to prescribe a general rule applicable* to all supposable cases." And on page 45 : " *Without attempting to establish a rule of general application*, we think that the one which shall most nearly, in general, accomplish these two conditions, will come nearest to *doing justice*." And the inconsistencies in their decisions, which will be apparent upon a perusal of all the cases, sufficiently prove, if proof were needed, that no rule of universal application is practicable. As an illustration of these inconsistencies compare *Deerfield* v. *Arms*, in which the rule applied was to give each proprietor as many portions of the new river bank as he owned in the old, or what, in the present case, is termed "division by proportional of old and new shore," with *Knight* v. *Wilder*, 2 Cush. 199, which was similar in its facts, and in which the line adopted was drawn

16

at right angles with the river, or what, in the present case, is called "division by shortest distance."

In other cases, also, the language of the courts implies a consciousness of the difficulty of devising a uniform rule governing in all cases. Thus, in *Emerson* v. *Taylor*, 9 Me. 42.

In *Stockham* v. *Browing*, 18 N. J. Eq., the chancellor said that the rules were "very unsettled," etc. See *Elgin* v. *Beckwith*; 7 West. Rep. (s. c. 118 or 119 Ill.) 707 ; *Gray* v. *Deluce*, 5 Cush. 9 ; *Att'y-Gen.* v. *Boston Wharf Co.* 12 Gray, 553 ; *Thornton* v. *Grant*, 10 R. I. 477, 489 ; *Smith* v. *St. Louis*, 30 Mo. 290 ; *Chapman* v. *Hoskins*, 2 Md. Ch. 485 ; *Mayor of New Orleans* v. *United States*, 10 Pet. 117 (Bk. 9 L. ed. 594).

In *Deerfield* v. *Arms, supra,* SHAW, Ch. J., says : "There can be nothing clearer, as a principal of *justice*, than that the riparian owner is entitled to the alluvial deposits formed against his own land by imperceptible degrees."

*Wales & Wales,* for the plaintiffs.

I. If it were material to the plaintiffs' case it might fairly be contended that the legal effect of the successive grants under which they make title is to bound their lot upon the river so as to include the bed of the stream to its middle thread. 2 Wash. Real. Prop. 632 ; Ang. Wat. s. 23 ; *Watson* v. *Peters*, 26 Mich. 508 ; *Gavit* v. *Chambers*, 3 Ohio, 496 ; *Ex parte Jennings* (Judge COWEN's note), 6 Cowen, 518 ; *Lamb* v. *Rickets*, 11 Ohio, 311.

It is insisted that a fair construction of the grants in the chain of the plaintiffs' title, and the deeds are by express reference all tied together, does not indicate an intention on the part of any of the plaintiffs' grantors to exclude the river bed from his conveyance. Ang. Wat. ss. 24, 28, 30 ; *Luce* v. *Carley*, 24 Wend. 451 ; *Cold Spring Iron Works* v. *Tolland*, 9 Cush. 492.

It is true that in the second deed, and all but one of those

that follow the words, " by the bank thereof," are inserted, but all these deeds incorporate, by reference, the description of the first deed, except the conveyance from Bishop to Brown, which revives the language of the earliest deed, and describes the river boundary as running " down said river." It is insisted that the words " by the bank " are used synonymously with " down said river " or " up said river," and only signify that the river line is to follow the course of the stream, and is not straight, not that there is any purpose to reserve the *alveus* from the grant.

See Vice-Chancellor GRIDLEY's construction of the grants in *Varick* v. *Smith*, 9 Paige, 547 ; also *Sleeper* v. *Laconia*, 60 N. H. 201.

II. But except in its possible bearing upon the rule of the distribution of the alluvion the inquiry whether the plaintiffs' land extends to the middle of the stream is unimportant. The grants are all sufficient to carry title to low water mark. " It may be considered a canon in American jurisprudence," says Mr. Justice SWAYNE, " that when the calls in a conveyance of land are for two corners at, in, or on a stream or its bank, and there is an intermediate line extending from one such corner to the other, the stream is the boundary, unless there is something which excludes the operation of this rule by showing that the intention of the parties was otherwise." *St. Clair Co.* v. *Lovingston*, 23 Wall. 46 ; *Starr* v. *Child*, 4 Hill, 369 ; *Lamb* v. *Rickets*, 11 Ohio, 311 ; *Jones* v. *Johnston*, 18 How. 150 ; *Halsey* v. *McCormick*, 13 N. Y. 296 (18 N. Y. 147).

But the conveyance of the bank to low water mark carries also the right to the alluvion.

It is the *ripa*, not the *alveus*, which is the foundation of riparian rights, and the ownership of the bank gives title to its growth in the nature of alluvion quite irrespective of any property in the bed of the stream. Ang. Wat. s. 53 ; *Lyon* v. *Fishmongers Co.* 17 Moak's Eng. Rep. 51 ; *Foster* v. *Wright*, 30 Moak's Eng. Rep. 648 ; *St. Clair Co.* v. *Lovingston*, 23

Hubbard v. Manwell.

Wall. 46; *Boorman* v. *Sunnuchs*, 42 Wis. 233; *Delaplaine* v. *C. & N. W. R. Co.* 42 Wis. 214.

So the alluvion would pass to the plaintiffs, the accumulated alluvion and all future increment of their bank, unless, as in some of the cases above cited, the calls of their deeds would cut off some portion of it. Such is not the case. In all the deeds subsequent to the first one, in which the description begins at the up-river corner of the Hubbard lot, the point of beginning is the up-river corner of the Russell or Manwell lot upon the upland, a point upon the old bank marked 'C' on the map. The third call is for a point on the bank of the river, the bank, that is, as it existed at the time of the successive grants, whence the boundary line proceeds either along the bank or in the thread of the stream to the point of beginning, the up-river corner of the Russell or Manwell lot. The legal effect of this term in the description is to carry the river line to the original corner projected to the thread of the stream, or to the bank at low water mark, in the direction in which the law would carry it in the distribution of the alluvion. The shore line or the mid-stream line is to be followed until it ceases to be applicable, which is at that point which is the true or legal corner of the Manwell lot. *Ipswich Petitioners*, etc. 13 Pick. 431; *Knight* v. *Wilder*, 2 Cush. 199 (at p. 210).

III. The final inquiry, therefore, is where is the legal up-river corner of the Russell or Manwell lot, which is the same with the question by what rule shall the alluvion be divided between these contiguous riparian owners.

If the plaintiffs' title goes to mid-stream, it is impossible to distinguish this case from the case of *Newton* v. *Eddy*, 23 Vt. 319; and the rule of that case should be adopted, which would divide the alluvion between the plaintiffs and the defendant by the line indicated on the map as drawn from the old corner on the up-land perpendicular to the stream.

The same rule is applied in the following cases: *Clark* v. *Campau*, 19 Mich. 325; *Aborn* v. *Smith*, 12 R. I. 371; *Porter* v. *Sullivan*, 7 Gray, 443.

If the rule of *Newton* v. *Eddy* does not seem equitable, then the rule adopted in *Deerfield* v. *Arms*, 17 Pick. 41, which gives to each owner upon the bank as many equal parts of the new shore as he had feet upon the old, a rule adopted from the civil law, and which has been approved by the U. S. Supreme Court in *Jones* v. *Johnson, supra,* is certainly as favorable to the defendant as he can claim. The rule laid down in *Emerson* v. *Taylor,* 9 Me. 44, gives substantially the same division line as the Massachusetts rule. Ang. Wat. s. 55.

The opinion of the court was delivered by

ROYCE, Ch. J. This was an action of trespass, *quare clausum,* in which the plaintiffs claim to recover for an entry upon land claimed by the female plaintiff, and the taking and carrying away timber growing thereon. The case was referred and was heard upon the report made. The referee found that the parties were the owners of two tracts of land in Burlington, lying upon the bank of Winooski River. The plaintiffs' land is situate above the land of the defendant, and extends along the river for about fifty rods, and the defendant's for about ninety rods. Since the parties acquired title to the above tracts of land the entire river front of plaintiffs' and defendant's land had gradually and imperceptibly receded toward the north by deposits and accretions made thereon by the stream, until, at the time of the alleged trespass, extending the side line of the plaintiffs' land straight to the nearer river bank, the alluvion so formed in front of their land amounted to about five acres, and the alluvion so formed in front of the defendant's land amounted to about eight and a half acres. The trespass claimed to have been committed was upon the alluvion formed in front of the defendant's land.

The plaintiffs claim that their ownership of the alluvion is not confined to that formed in front of their land, but extends to and embraces a portion of that formed in front of the defendant's land, and that the alluvion should be divided between

the parties by a line called " division by shortest distance," which is to be drawn from the point of intersection of Mrs. Hubbard's westerly line with the old bank of the river, as described in the deed referred to in report from Lyman and wife to Ballou, " northwesterly to the nearest point on the present river bank perpendicularly to the thread of the stream, making an acute angle with said westerly bank, as defined in said deed; or, if that line of division should not be considered the true and correct one, then said alluvion should be divided between the parties by a line called ' division by chord perpendiculars,' according to the rule laid down in *Emerson* v. *Taylor*, 9 Me. 44, extending from said point of intersection nearly north to the present river bank, striking the same at a point about nineteen and three fourths rods up stream, or easterly from where said line called " division by shortest distance," strikes the present river bank; or if neither of said lines of division should be adopted, then a line called ' division by proportional of old and new shore,' according to the rule adopted in *Deerfield* v. *Arms*, 17 Pick. 41, dividing said accretion between the parties in proportion to the extent of their respective lines on the old river bank, should be adopted."

The defendant claimed that the true line of division of said alluvion was a line corresponding with the westerly line of Mrs. Hubbard's land, as described in said deed from Lyman and wife to Ballou. In other words, that the accretions formed along the river bank of plaintiffs' land belonged to them, and those formed in front of his own land to him.

And such we understand the general rule to be in the case of non-navigable streams. 3 Kent Com. p. 428; Boone's Law of Real Property, s. 254.

Alluvion has been defined to be an addition to riparian land gradually and imperceptibly made by the water to which the land is contiguous, and to be an inherent and essential attribute to the original property; and is said to rest in the law of nature, and is analogous to the right of the owner of a

tree to its fruits and the owner of flocks and herds to their natural increase. *County of St. Clair* v. *Lovingston*, 23 Wall. 46.

The owner takes the chances of injury and of benefit arising from the situation of his property: If there be a gradual loss, he must bear it; if a gradual gain, it is his.

All the cases cited in the briefs of counsel where a different rule from this natural and obvious one has been adopted, including those cases where either one of the rules contended for by the plaintiffs here has been applied, were either cases, where from their peculiar circumstances some such method of division seemed essential to a fair and just distribution between the riparian owners, or depended upon the fact that the lands in question bordered on a navigable stream and derived a great part of their actual value from that circumstance and from the benefit of the public easement. Per SHAW, Ch. J., in *Deerfield* v. *Arms, supra.*

The only case to which we have been referred where this court has been called upon to pass on a similar question was that of *Newton* v. *Eddy*, 23 Vt. 319, where the opinion was written by Judge REDFIELD, who dissented from the result arrived at by a majority of the court. It was decided upon its own peculiar circumstances and with the express recognition on the part of the court of the fact that its decision would not be likely to establish any general rule and with a confession from the dissenting judge that, for his part, he should have preferred the rule of the civil and common law.

All the authorities collected in defendant's brief agree in recognizing the fact that the law on this subject is very unsettled and in confessing the impossibility of establishing a uniform rule which shall be calculated to meet the infinitely varying circumstances of cases that may arise and to secure to the parties in every case a just and equitable distribution of alluvial lands. The object of all the cases, as defined by SHAW, Ch. J., in *Deerfield* v. *Arms*, is " to establish a rule of division among these proprietors which will do *justice to each*, where no

positive rule is prescribed and where we have no direct judicial decision to guide us."

With this consideration in view, and applying the principle announced at the outset in regard to the natural and inherent right of the owner of land, in the absence of any arbitrary rule on the subject and when consistent with the rightful claims of others, to its accretions and increments, as he correspondingly runs the risk of loss, to ascertain what portion of the alluvion belonged to the plaintiffs, the side lines of their land should be extended to the nearest river bank; and adopting that rule, it will be seen that no portion of the land, upon which the trespass is alleged to have been committed, belonged to the plaintiffs. And no injustice or unfairness is wrought by this method of division. The defendant has lost by attrition about seven acres situate on that portion of the river bank lying below said alluvial deposit. His total gain, therefore, is only about one and a half acres; while the plaintiffs have sustained no such loss to be offset against their gain. It can hardly be claimed that these circumstances are such as to require a resort to any arbitrary rule for the purpose of working out a fair and equitable distribution. The "peculiar circumstances" governing the decision in so many of the cases cited in favor of the parties claiming the benefit of some such rule, clearly, do not exist here, and for that reason alone those cases could not be relied upon as authorities in this.

Judgment reversed, TAFT, J., dissenting.